UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION


ALLIED FEDERATION, BROTHERHOOD OF                           PLAINTIFF
MAINTENANCE OF WAY EMPLOYEES
DIVISION OF INTERNATIONAL
BROTHERHOOD OF TEAMSTERS


v.                                                CIVIL ACTION NO. 3:21-CV-00013


CSX TRANSPORTATION, INC.                                    DEFENDANT


## MEMORANDUM OPINION

### I.      *Posture of Case*

This matter is before the Court on the motion of Defendant CSX Transportation, Inc. ("CSXT") for summary judgment pursuant to Federal Rule of Civil Procedure 56. DN 25. CSXT claims that there are no genuine issues of material fact as to whether the action brought by Plaintiff Allied Federation, Brotherhood of Maintenance of Way Employees Division of International Brotherhood of Teamsters ("BMWE" or the "Union") regarding the rollout of CSXT's new electronic timekeeping system constitutes a "minor dispute" under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* and, hence, is subject to arbitration. DN 25, PageID# 860. BMWE filed a response, and CSXT replied. DN 28; DN 29. This matter is now ripe for adjudication. For the reasons stated below, CSXT's motion will be granted.

## II.    *Factual and Procedural Background*

CSXT is a large freight railroad corporation and is a "carrier" within the meaning of the RLA, 45 U.S.C. § 151. DN 1, PageID# 4. BMWE is a labor union that represents CSXT's maintenance-of-way employees and is an "organization" within the meaning of the RLA, 45 U.S.C. § 151. *Id.*, PageID# 3. The parties entered into a collective bargaining agreement ("CBA"), which governs the terms of employment of CSXT's BMWE-represented employees. *Id.*; DN 15-3.

This case "centers on CSXT's implementation of 'TIMEtrax,' a component of its payroll system used for tracking employee time." DN 15, PageID# 81; *see also* DN 1 ¶ 3. In 2018, CSXT implemented a limited rollout of this new program for approximately fifty BMWE-represented employees. DN 15-2, PageID# 112. The program went into effect for all of CSXT's maintenance-of-way employees on November 14, 2020. *Id.* At that time, counsel for BMWE sent a letter to CSXT demanding that it immediately rescind the program, claiming the program constituted a change in the terms of the CBA and therefore required CSXT to bargain with the Union. DN 15-6. CSXT denied these allegations and refused to rescind the timekeeping system. DN 15-7. After a period of correspondence between the parties did not resolve the matter, BMWE notified CSXT that it would be filing suit in federal court. DN 15-10, PageID# 436.

BMWE then filed this action seeking declaratory judgment and injunctive relief. DN 1. The complaint alleges violations of the RLA as well as irreparable injury to BMWE and the CSXT employees it represents. *Id.*, PageID# 9–12. The thrust of the complaint is BMWE's claim that the new timekeeping system and related rules require employees to clock in during a seven-minute window prior to the beginning of their scheduled start time and to clock out during a seven minute window after their scheduled end time. *Id.*, PageID# 5. BMWE alleges that since employees are

2

not compensated for this time, during which they are clocked in outside of their regularly scheduled worktime, the new timekeeping policy "abrogates" express terms of the CBA regarding standard workdays and workweeks, as well as payment and calculation of overtime. *Id.*, PageID# 6–8. Specifically, the complaint alleges that CSXT's unilateral implementation of TIMEtrax and its refusal to bargain with the Union violates Section 6 of the RLA, which lays out certain requirements that must be met before changing the terms of a prior agreement, such as giving notice, bargaining, and maintaining the status quo until the parties reach an agreement. *Id.*, PageID# 9–10; 45 U.S.C. § 156.

In September 2021, CSXT filed the present motion for summary judgment. DN 25. CSXT attached various affidavits and exhibits to its motion indicating that employees are not actually required to clock in before their scheduled start time or to clock out after their scheduled end time. *See, e.g.*, DN 25-1, PageID# 878; DN 15-2, PageID# 887. Rather, the evidence suggests that the new program merely features a "grace period" of seven minutes before and after employees' scheduled start and end times during which employees may clock in or out and still be considered to have worked a full workday. DN 25-1, PageID# 878. CSXT argues that there are no genuine issues of fact as to whether the current dispute over the implementation of TIMEtrax is a "minor" one, which falls under the exclusive jurisdiction of the arbitration boards established under the RLA, and that, as such, CSXT is entitled to summary judgment on this issue. DN 25, PageID# 860.

### III.    *Legal Standard*

Summary judgment is appropriate when the moving party shows that, for each claim or defense on which judgment is sought, there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v.*

3

*Catrett*, 477 U.S. 317, 322 (1986).  The moving party may show the absence of any genuine issue of material fact by "demonstrating that the nonmoving party lacks evidence to support an essential element of its case." *Ford v. GMC*, 305 F.3d 545, 551 (6th Cir. 2002). The moving party may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that negate an essential element of the nonmoving party's claim. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. 317 at 322.

If the moving party makes this showing, "the burden . . . shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. DOT*, 53 F.3d 146, 150 (6th Cir. 1995). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Rather, to overcome a motion for summary judgment, the nonmoving party must produce "significant probative evidence." *See Moore*, 8 F.3d 335, 339-40 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court must view the evidence in the light most favorable to the non-moving party and grant a motion for summary judgment only "if the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party." *Cox*, 53 F.3d 146, 150 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989)).

## IV.    *Major and Minor Disputes Under the RLA*

The classification of a dispute as "major" or "minor" under the RLA is consequential, as it greatly impacts the availability and scope of judicial review. *See Airline Prof'ls Ass'n of the Int'l Bhd., of Teamsters, Local Union No. 1224 v. ABX Air, Inc.*, 274 F.3d 1023, 1027–28 (6th Cir.

2001) (hereinafter "*ABX I*"). When the dispute is determined to be major, "the RLA mandates a lengthy process of negotiation and mediation before either party may resort to self-help" and district courts "have subject matter jurisdiction to enforce the status quo" until this process is exhausted. *Id.* at 1028. On the other hand, district courts have no jurisdiction over minor disputes, which are "subject to compulsory and binding arbitration before an adjustment board." *Id.* Thus, when confronted with a dispute under the RLA, the court's "the first order of business" is to determine whether the dispute is major or minor. *Intl. Bhd. of Teamsters v. Kalitta Air, LLC*, 15-13527, 2015 WL 6561715, at *3 (E.D. Mich. Oct. 30, 2015).

Minor disputes are resolvable under the terms of an existing collective bargaining agreement, while major disputes are not. *See Kalitta Air*, 2015 WL 6561715 at *3 (distinguishing major and minor RLA disputes). If the parties disagree as to the nature of the dispute, the court must "recharacterize the dispute consistent with the statutory definitions." *Id.* (citing *Conrail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 306 (1989)). In doing so, the court should look to the language of the CBA, as well as the "practice, usage, and custom" of the parties. *Conrail Corp.*, 491 U.S. at 311. Ultimately, the question the court must answer is whether "the terms of an existing agreement either establish or refute the presence of a right to take the disputed action." *Kalitta Air*, 2015 WL 6561715 at *4.

If an employer claims that it has the discretion to take a certain action and shows that this claim is "arguably justified" under the terms of the collective bargaining agreement, the dispute is minor and "the court[] must defer to the arbitral jurisdiction of the Board." *Conrail Corp.*, 491 U.S. at 310. To make this showing in the Sixth Circuit, the employer's burden is "relatively light" and "[i]f there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor." *Flight Options, LLC v. Int'l Bhd. of Teamsters, Local 1108*, 863 F.3d 529,

539 (6th Cir. 2017) (cleaned up). If the employer cannot meet this burden, the employer's claim is considered "obviously insubstantial or frivolous" and the dispute is major. *Conrail Corp.* at 310.

For the reasons discussed below, the Court finds that CSXT has met its burden to show that it is "arguably justified" in its claim that implementing a new timekeeping system was within its discretion under the CBA and the Union has not shown that a genuine issue of material fact exists as to this issue. Consequently, the Court holds that the instant controversy is a minor dispute.

## V.   *Analysis*

### A.  *Language of CBA*

#### 1.  *CSXT's Asserted Discretionary Right*

While there is no evidence of an express provision of the CBA that gives CSXT the authority to implement a timekeeping system, CSXT claims that it had the discretion to do so pursuant to its "inherent managerial rights" under the CBA. DN 25, PageID# 861-63. The Sixth circuit has recognized such a claim to rights, holding that a CBA "need not include provisions permitting management action on every conceivable employment matter; rather, on issues not discussed in the Agreement, management retains discretion." *Appalachian Regional Healthcare v. United Steelworkers of America*, 245 F.3d 601, 606 (6th Cir. 2001)). *See also ABX I*, 274 F.3d at 1029 ("[M]anagement retains discretion with respect to the hiring, firing, promoting, supervising, planning, and other management functions, except as limited by the collective bargaining agreement and public law.") (citing *Appalachian Regional Healthcare* at 604-05).

The Court finds *Sanzari v. Metro-North Railroad Company*, a case recently before another district court and factually similar to the one at bar, to be instructive on this point. No. 19-cv-8689 (LJL), 2021 U.S. Dist. LEXIS 24736 (S.D.N.Y. Feb. 9, 2021). In *Sanzari*, the union claimed that the carrier's implementation of a new time management system and the policies that accompanied

it were neither expressly nor impliedly permitted under the CBA. 2021 U.S. Dist. LEXIS 24736, at *4-*10, *24. The carrier, on the other hand, maintained that certain provisions of the CBA related to the duration of work shifts and employee compensation gave the carrier the implicit right to "establish or change reporting procedures." *Id.* at *21. The district court agreed, finding that, "[f]or at least two reasons, it is at least arguably implicit that [the carrier] retained the unilateral right to make the changes to the [time management system] at issue here." *Id.* at *28.

> First, as the Supreme Court has repeatedly made clear, "[a] collective bargaining agreement is not an ordinary contract . . . it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *See Conrail*, 491 U.S. at 311-312. One of those cases that a draftsman could not wholly anticipate but that arguably would at least be implicit in the collective bargaining agreement is that management would need a system to measure and determine when employees began and ended their shifts and that those systems would change with changes in technology. There is no evidence whatsoever before the Court that the parties intended by the collective bargaining agreement to freeze in place all of the terms of the existing crew management system unless and until the union agreed to the changes through collective bargaining or as a result of the purposefully long and drawn out process of negotiation and mediation or management prevailed through the exercise by each side of economic self-help.
>
> Moreover, as a matter of contract law, . . . "[t]hat a particular provision has not been expressly stated in a contract does not necessarily mean that no such covenant exists." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 385 N.E.2d 566, 412 N.Y.S.2d 827, 831 (1978). Rather, "the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* (citation omitted).

*Id.* at *28-*30. The court stated that, "at the very least" the carrier was "arguably justified" in its claim that, under "an agreement that contemplates that shifts will be of a specific duration and under which its obligation to pay wages is dependent on the number of hours each employee

works," the carrier had the "discretion to create a timekeeping system for monitoring the duration of work shifts." *Id.* at *30.

The rationale from *Sanzari* is applicable to the case at bar. As in *Sanzari*, there is no evidence that the parties to the instant case had any bargained-for or implied agreement regarding the methodology or technology to be used for tracking employee time. And, as discussed below, the Union fails to show that implementing a new timekeeping system violated, abrogated, or modified any provision of the CBA. Therefore, for all the reasons cited by the court in *Sanzari*, it is at least arguable that, as part of its implicit authority to manage, CSXT had the discretion to implement or make changes to the system it used to monitor employee work hours.

### 2. *Alleged Abrogation of CBA Terms*

Attempting to overcome CSXT's assertion of implicit contractual rights, the Union claims that, notwithstanding any managerial discretion provided to CSXT by the implied terms of the CBA, "CSXT's unilateral implementation of TIMEtrax and the new clock-in and clock-out rules are antithetical to, and *effectively* abrogate, the express terms and conditions set forth in the 2012 CBA." DN 28, PageID# 1548 (emphasis added). Thus, the Union's argument is that, though there is no CBA language explicitly governing the implementation of the timekeeping system itself, a change to this system can, *in effect*, result in the modification of other express terms of the agreement.

Here, the Union equates the implementation of TIMEtrax to a unilateral change in CBA provisions protecting the "pay, rules, or working conditions" of Union-represented employees, which is a violation of the RLA. *Id.*, PageID# 1558; 45 U.S.C. § 152 Seventh ("No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in

Section 156 of this title."). Accordingly, the Union characterizes the instant controversy as a major dispute under the RLA. DN, 28, PageID# 1558, 1559.

In particular, the Union claims that CSXT's unilateral implementation of TIMEtrax has "substantively changed" Rules 3, 9, 10, and 11 of the CBA. DN 1, PageID# 6-8; DN 28, PageID# 1555, 1558. The portions of these rules that the Union has identified as relevant are as follows:

**Rule 3:**

Section 1. Assignment to position.
In the assignment of employees to positions under this Agreement, seniority shall govern. The word "seniority" as used in this Rules means, first seniority in the class in which the assignment is to be made, and thereafter, in the lower classes, respectively, in the same group in the order in which they appear on the seniority district roster.

Section 3. Advertisement and award.
(a) All positions and vacancies will be advertised within thirty (30) days previous to or within twenty (20) days following the dates they occur. The advertisement shall show the position, title, rate of pay, headquarters, tour of duty, rest days and designated meal period.

**Rule 9:**

(a) Except as otherwise provided, eight (8) consecutive hours (ten (10) hours for four (4) day gangs), exclusive of meal period, worked or held for duty, shall constitute a day.

**Rule 10:**

(a) General
The carrier will establish for all employees, subject to exceptions contained in these rules, a work week of 40 hours consisting of five days of eight hours each, with two consecutive days off in each seven; the work weeks may be staggered in accordance with carrier's operational requirements; so far as practicable the days off shall be Saturday and Sunday. The foregoing work week rule is subject to the following provisions:

(l) Production crews (a mobile and mechanized gang consisting of ten (10) or more employees), including locally based supporting BMWE forces whose assignment is associated with that of a

production crew to the extent that a different work week of rest days for such crews, on the one hand, and such supporting forces, on the other, would delay the work or otherwise interfere with its orderly progress, may be established consisting of five (5) eight (8) hour days followed by two (2) consecutive rest days. One of those rest days shall be either a Saturday or a Sunday, and both weekend days shall be designated as rest days here there is no need for weekend work.

(m) Production crews, and local supporting forces, as defined above, may be established consisting of four (4) ten (10) hour days, followed by three (3) consecutive rest days, in lieu of five (5) eight (8) hour days. The rest days of such compressed workweek will include either Saturday or Sunday. However, where there is no carrier need for weekend work, production crews will be given both weekend days as rest days.

**Rule 11:**

(a) Time worked preceding or following and continuing with a regularly assigned work period shall be computed on the actual minute basis and paid for at time and one-half rates, with double time computed on the actual minute basis after sixteen (16) continuous hours of work in any 24 hour period computed from the starting time of the employee's regular shift. . . .

(b) The starting time of the work period of other than regularly assigned employees temporarily brought into service in emergencies, will be considered as of the time they commence work or are required to report.

DN 1, PageID# 6-8 (citing DN 25-3, PageID# 904, 916, 919, 920).

At the outset, the Court is puzzled as to the relevance of Rule 3 to this action. The Union's own description of this rule is that it "deals with job postings and bidding procedures." DN 1, PageID# 7. CSXT also portrays JOBtrax as "the program used to advertise and bid on assignments" and states that it is "a different system" from TIMEtrax. DN 25, PageID# 867. The Union makes

no claims as to the JOBtrax system and proffers no facts or arguments showing that the implementation of TIMEtrax "unilaterally changed" Rule 3 in any way.

With respect to Rules 9, 10, and 11, the Union alleges that "CSXT's inherent management rights argument collides with the express language" of these rules. DN 28, PageID# 1557. The Union cites several cases in support of the proposition that "[c]arrier actions challenged as unilateral changes have been held to involve major disputes where courts have found that the challenged actions conflicted with clear contract language, and where the actions were not even 'arguably justified' by the agreement terms or past practices relied on by the carriers." *Id.*, PageID# 1553. However, the instant case is distinguishable from the only Sixth Circuit case the Union cites.

In *Wheeling & Lake Erie Railway Company v. Brotherhood of Locomotive Engineers & Trainmen*, the focus of the dispute was on a "crew consist provision" in the CBA between the parties, mandating that all railroad crews include at least one conductor and one brakeman, except as otherwise provided by the CBA. 789 F.3d 681, 684 (6th Cir. 2015). Over the course of many years, the railroad had tried, unsuccessfully, to renegotiate the terms of the CBA to eliminate this provision. *Id.* 684-87. After learning that the railroad had violated the crew consist provision by operating trains with a "management employee" instead of a conductor on several occasions, the union sought to enter mediation, but the railroad refused. *Id.* The union members subsequently went on strike and the railroad filed suit in district court for a preliminary injunction. *Id.* at 687.

The railroad took the position that the CBA was silent on the issue of whether it could use management personnel when a union conductor was unavailable and, hence, the railroad was arguably justified in claiming it had the managerial discretion to do so. *Id.* at 688. The district court agreed and granted the preliminary injunction. *Id.* On appeal, the union argued that the railroad's position was not arguably justifiable, as it directly collided with the express requirement in the

CBA that "all trains shall include at least one conductor." *Id.* at 689 (internal quotation marks omitted). The union maintained that the court's decision below "was improper because it essentially re-wrote the crew consist rule to include another exception in the Railroad's favor— allowing use of management personnel in place of union conductors when necessary—an exception the parties did not bargain for and to which [the union] did not agree." *Id.*

The Sixth Circuit held in favor of the union because the railroad was attempting to circumvent an express provision of the CBA that limited the very conduct in which the railroad sought to engage. *Wheeling*, 789 F.3d at 693-94. The court distinguished *Wheeling* from *ABX I*, in which the Sixth Circuit held that, though no there was no explicit authorization in the CBA for "ABX to unilaterally implement random employee searches," under the implied terms of the CBA, "it was at least arguable" that ABX was permitted to do so. *Id.*at 693 (citing *ABX I*, 274 F.3d at 1029). The *Wheeling* court noted that in *ABX I* there was no express limitation on ABX's discretion in the CBA and ABX "had, in the past, exercised unilateral control over its employee searching policy." *Id.* at 693-94. In contrast, the court stated, the CBA in *Wheeling* expressly limited the railroad's managerial discretion by requiring the railroad to "assign at least one union conductor to each train" and, "[m]oreover, the record in this case does not support a finding that the Railroad exercised unilateral control over its conductor assignment policy in the past." *Id.* at 694.[1] The *Wheeling* court, thus, held that the railroad was not arguably justified by its implied managerial discretion under the CBA and the dispute between the parties was major. *Id.*

In the case at bar, there is no evidence of an express provision of the CBA that limits CSXT's discretion with respect to the system that it uses to track employee time. Thus, the case is

---

[1]Likewise, the court distinguished the dispute in *Wheeling* from that in *Airline Professionals Association v. ABX Air, Inc.*, 400 F.3d 411, 415 (6th Cir. 2005) (hereinafter "*ABX II*"), where "the CBA contained 'neither an express authorization for nor an explicit prohibition of'" the policy in controversy and, thus, the carrier implicitly "retained management prerogative" to implement the policy. 789 F.3d at 694 (quoting *ABX II* at 416).

more analogous to *ABX I* than *Wheeling*. The Union's argument that the implementation of TIMEtrax is equivalent to an abrogation of "clear contract language" governing the "pay, rules, or working conditions" of Union-represented employees is untenable in light of the evidence.

As stated by CSXT, the "grace period" provided by the TIMEtrax system, "does not in any way change the required length of an employee's day, when their shifts are schedule to start or end, or how much they must work to receive overtime under the CBA." DN 25, PageID# 868. The main distinction between the old and new timekeeping systems appears to be that, under TIMEtrax, the employee is responsible for clocking in and out of the time tracking software, whereas in the past this responsibility fell on the employee's manager. *See* DN 25-1, PageID# 878-79 (explaining this difference). However, besides the procedural differences between the two systems, the pay of Union employees, as well as the rules and working conditions imposed upon them, seem to be unchanged by the "clocking in and out" requirements of the TIMEtrax system.

The Union asserts that "prior to implementing TIMEtrax, Union-represented employees were not required under the contract to report to work before the start of their work periods, and they were not compelled under the contract to be held for duty following the completion of their work periods unless they were assigned to work overtime" and "CSXT employees represented by the Union were neither required by contract to clock in before, nor clock out after, their scheduled workdays." DN 28, PageID# 1547-48. There is no evidence that these policies have changed with TIMEtrax. Michael Skipper, Senior Director of Labor Relations at CSXT, spoke to this very point in a December 2020 letter to Union representatives:

> [W]e would like the opportunity to clarify any possible misconceptions that employees or the Organization may have. CSX expects all employees to be clocked in and begin work at the designated starting time, and to clock out and cease all work at their designated shift's end. The presence of small grace periods to physically clock in and out does not change these long-standing

expectations, but rather dictates how employees are to be paid when they clock in or out up to seven (7) minutes on either side of their starting or ending time, as indicated below:

- 7 minutes before start of shift: time rounded forward to the starting time of the assignment
- 7 minutes after start of shift: time rounded back to the starting time of the assignment
- 7 minutes before end of shift: time rounded forward to the ending time of the assignment
- 7 minutes after end of shift: time rounded back to the ending time of the assignment

This application [of the grace period] is no different than the informal practice that existed for the 20+ years that BMWE employees have been paid through the prior legacy mainframe payroll system. Previously, employees would report to the jobsite in advance of their assigned shift start, would begin working at their designated starting time, and would conclude their day at their assigned shift ending time. Under those circumstances, the employee would be paid eight (8) or ten (10) hours straight time (depending on their assigned work schedule) despite having arrived to the worksite a few minutes early (or a few minutes late), or left the job site a few minutes early (or a few minutes late). This historical application is consistent with the collective bargaining agreement, in particular Rule 9, and has never been questioned or challenged by the Organization. Nor has this or will this practice result in employees performing work for which they are not fully compensated.

DN 25-10, 1209-1210. Jennifer Higginbotham, Senior Director, Payroll and Labor Services for

CSXT, similarly characterized the new and old systems:

[T]he grace period does not require an employee to clock in prior to the start of their shift or to clock out after their shift has ended. While the grace period allows employees to do so, there is no requirement that they utilize that option. Thus, employees can elect to clock in exactly at the start of their shift or up to 7 minutes after their shift has started without having their pay reduced. Likewise, employees may clock out exactly at the scheduled end time or they can clock out up to 7 minutes before their shift is set to end without having their pay docked.

. . .

14

> [U]nder the [old timekeeping] system, employees were regularly
> marked down as having started their shift at their scheduled start
> time even if they arrived at their worksite a few minutes early or a
> few minutes late; and were marked as having worked their full shift
> even if they left at the end of the day a few minutes before their
> scheduled end time or a few minutes after.

DN 25-1, PageID# 878-79.

The Union maintains that, under the TIMEtrax system, Union-represented employees must report for work before the start of their scheduled shift and "numerous employees" have reported having to stay after the end of their scheduled shifts in order to "clock out." DN 28, PageID# 1555-56. Yet, as the record shows, employees are not "compelled" under the TIMEtrax system to report to work prior to the start of their shift or to stay after their shift ends. That some employees may show up for work early, clock in before their shift is scheduled to start, or clock out after their shift is scheduled to end does not evidence that such actions are mandatory for full compensation or that the method of calculating employee pay under TIMEtrax differs from the method that was previously in place.

Regarding CSXT's overtime compensation policy, as explained by both Higginbotham and Skipper, CSXT does not mandate, or even allow, employees to engage in work outside of their regular shift without prior permission, but, in the event that an employee works overtime with supervisor permission, the employee is fully compensated. *Id.*; DN 25-10, 1210. *See also* Dec. Skipper, DN 25-2, PageID# 886 (explaining that TIMEtrax is programmed to automatically account for increased pay for employees who work outside of their scheduled shift). The Union offers no evidence that this policy was changed by the implementation of TIMEtrax.

The Union also alleges that the TIMEtrax system modifies CSXT's implicit attendance policy. DN 1, PageID# 8; DN 28, PageID# 1558. However, this is not borne out by the evidence. Taking as true the Union's claim that, prior to TIMEtrax, the implicit policy between the parties

15

was that Union employees were "neither subject to nor held accountable under CSXT's attendance rules for periods prior to the commencement of their regularly scheduled workday(s) and following the completion of their regularly scheduled workdays,"[2] the Union makes no showing that this policy has been modified by TIMEtrax.[3] Accordingly, the Union's reliance on the purported change to the implicit attendance policy does not defeat CSXT's claim.

In sum, the Union has not shown that CSXT's position is analogous to the railroad in *Wheeling* or that the changes brought forth by the implementation of TIMEtrax have abrogated or modified an express or implied term of the CBA.

### B. Past Practice

The analysis of the past "practice, usage, or custom" of the parties also favors CSXT. As in *ABX I*, CSXT has exercised unilateral control over employee timekeeping in the past. *See* DN 25, PageID# 848-50. For example, the previous timekeeping platform, Mainframe, was implemented about thirty years ago with no bargaining between the Union and CSXT. DN 25-2, PageID# 884. Since that time, CSXT has implemented other payroll and time tracking systems without bargaining with any union, BMWE or otherwise. DN 25-1, PageID# 874-76; DN 25-2, PageID# 883-84. Indeed, in his sworn affidavit, Skipper declared that he was "not aware of any

---

[2] DN 28, PageID# 1556.
[3] The Union asserts CSXT has "conceded" that "TIMEtrax . . . includes a new feature that triggers and assesses attendance policy infractions for personnel who fail to clock in or out within the Orwellian-characterized 'grace periods.'" DN 28, PageID# 1558. However, the Court has found no such concession. In fact, in the reply brief, CSXT explicitly states, "nothing about the adoption of TIMEtrax has altered CSXT's attendance policy." DN 29, PageID# 1634. The Court notes that, at present, CSXT has "temporarily disabled the function within its disciplinary system that reports attendance infractions so that employees could become familiar with the system without fear that they would be punished for making honest mistakes." DN 25, PageID# 869. Nonetheless, even if the system were to be restored, the record is devoid of evidence that an employee would be subject to disciplinary action under TIMEtrax for clocking in at his or her scheduled start time (or during the seven minutes prior) or clocking out at his or her scheduled end time (or during the seven minutes that follow). To the extent that a "policy infraction" might be triggered under the disciplinary system if an employee clocks in after the start time of his or her scheduled shift or clocks out before the end of his or her scheduled shift, there is no evidence that this practice is any different from the practice prior to the implementation of TIMEtrax.

instance in which CSXT has bargained with [BMWE] or any other Non-Operating craft union regarding the payroll systems that [CSXT has] chosen to use." DN 25-2, PageID# 884.

The Union criticizes CSXT's reliance on past unilateral changes to timekeeping and payroll systems, claiming the examples CSXT provides "do not support a finding of an established course of dealing between the parties that rises to the dignity of an established past practice." DN 28, PageID# 1560 (citations omitted). The Union argues that "CSXT's claim of a past practice in support of its RLA minor dispute argument consists primarily of transactions between itself and work groups not represented by the BMWE[], and even transactions between other carriers and labor unions." *Id.* Overall, the Union tries to distance the instant case from the examples cited by CSXT, maintaining that "CSXT's cited examples of purported past practice are inapposite to CSXT's November 2020 unilateral implementation of TIMEtrax." *Id.*, PageID# 1562.

Aside from these criticisms, however, the Union offers no evidence that CSXT ever engaged in collective bargaining when implementing or changing systems for payroll or timekeeping. Thus, the evidence before the Court indicates that CSXT has a history of unilaterally putting these systems into place or modifying those that already exist. The only conclusion supported by such evidence is that timekeeping and payroll management has traditionally been "left in the hands" of CSXT. *See Conrail*, 491 U.S. at 317 (finding that the carrier had the discretion to implement drug testing, as "[i]n the past, the parties have left the establishment and enforcement of medical standards in [the carrier's] hands").

*C. Conclusion*

Having found that CSXT's claim of managerial discretion is "arguably justified" by the terms of the CBA and determined that the Union has not shown that a genuine issue of material

fact exists as to this issue, the Court concludes that the dispute between the parties is minor. As such, this Court lacks jurisdiction over this matter.

The Court reiterates that it is not now deciding the merits of the underlying case. Whether the terms of the CBA, in fact, allowed CSXT to make unilateral changes to the employee timekeeping system is a question for arbitration. The Court has only decided that CSXT has met its "relatively light" burden to make an "arguably justifiable" claim that implementation of the TIMEtrax system was within its discretion under the CBA. *Conrail Corp.*, 491 U.S. at 307, 310. By referring the parties to arbitration, the Court will "assur[e] that collective-bargaining contracts are enforced by experts in 'the common law of [the] particular industry,'" as required by the RLA. *Id.* at 310 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 579 (1960)).

For the reasons cited above, CSXT's motion for summary judgment will be granted in a separate order.

April 18, 2022

Charles R. Simpson III, Senior Judge
United States District Court

18